| | |
|---|---|
| **FIN & FEATHER CHALETS, LLC** | **CIVIL ACTION** |
| **VERSUS** | **NO. 13-6082** |
| **SOUTHERN ENERGY HOMES, INC., ET AL** | **SECTION: "G"(3)** |

## ORDER AND REASONS

This litigation arises out of Plaintiff Fin & Feather Chalets, LLC's purchase of two mobile homes that were damaged during Hurricane Isaac. Pending before the Court are Defendants NTA, Inc. and Southern Energy Homes, Inc.'s "Motion to Dismiss as Premature or to Compel Arbitration"[1] and Discount Sales Inc.'s "Motion to Dismiss as Premature or to Compel Arbitration."[2] After considering the pending motions, the memoranda in support, the memoranda in opposition, the record, and the applicable law, the Court will grant the motions.

## I. Background

### A.  Factual Background

Plaintiff Fin & Feather Chalets, LLC alleges that on or about August 28, 2012, Hurricane Isaac "made landfall . . . caus[ing] significant damage to . . . Plaintiff's Rental Properties," which were two mobile homes manufactured by Defendant Southern Energy Homes, Inc. and purchased by Plaintiff from Defendant Discount Sales, Inc.[3] Plaintiff contends that it signed a purchase agreement and paid Discount Sales a $16,000 deposit on April 17, 2007,[4] and then "purchased the homes" on September 27, 2007, at which time it also signed documents "containing an arbitration

---

[1] Rec. Doc. 16.

[2] Rec. Doc. 20.

[3] Rec. Doc. 1–1 at 3–4.

[4] Rec. Doc. 21 at 2.

provision."[5]  Plaintiff alleges that the price of each of the two mobile homes purchased was $36,200.[6]

According to Plaintiff, Defendant Discount Sales had advertised the homes as being able to withstand winds of up to 140 miles per hour.[7] Furthermore, according to Plaintiff, "Hurricane Isaac's winds never reached, exceeded, or came close to one hundred forty (140) miles per hour."[8] However, Plaintiff asserts that Hurricane Isaac caused "significant structural damage to [Plaintiff's] Rental Properties."[9] Plaintiff maintains that the mobile homes purchased were "defective in both [their] design and manufacture," that Defendants "fraudulently and falsely represented that the Rental Properties did not contain the defects," and that Defendants "acted fraudulently by informing [Plaintiff] at the time of purchase that its Rental Properties could sustain wind loads of one hundred forty (140) miles per hour."[10]

## B.  Procedural Background

On August 28, 2013, Plaintiff filed suit in Louisiana state court, bringing claims for redhibition, violation of the Louisiana Unfair Trade Practices Act, negligence, negligent or intentional misrepresentation, violation of the Louisiana Product Liability Act, detrimental reliance, breach of contract, and fraud.[11]  In its state court petition, Plaintiff names as defendants Southern Energy Homes, Inc. ("Southern Energy"), a corporation domiciled in Alabama; Discount Sales, Inc.

---

[5] Rec. Doc. 1–1 at 3.

[6] *Id.* at 4.

[7] *Id.* at 3.

[8] *Id.* at 4.

[9] *Id.*

[10] *Id.* at 5.

[11] *Id.* at 6–9.

("Discount Sales"), a corporation domiciled in Mississippi; Landry Mobile Home Transporters, Inc. ("Landry"), a corporation domiciled in Louisiana; NTA, Inc. ("NTA"), a corporation domiciled in Indiana; and ABC Transport Corporation ("ABC Transport"), a fictitious corporation allegedly domiciled in Louisiana. On October 8, 2013, Defendants Southern Energy and NTA removed this case to federal court, asserting diversity jurisdiction pursuant to 28 U.S.C. § 1332.[12] Plaintiff filed a "Motion to Remand" on November 7, 2013, contending that both ABC Transport and Plaintiff are domiciled in Louisiana, depriving the Court of diversity jurisdiction over the case.[13] The Court, on Plaintiff's motion, dismissed Plaintiff's claims against Landry without prejudice on January 7, 2014,[14] and denied Plaintiff's Motion to Remand on June 3, 2014.[15]

On February 5, 2014, NTA and Southern Energy filed a "Motion to Dismiss as Premature or to Compel Arbitration."[16] On February 10, 2014, Discount Sales filed a "Motion to Dismiss as Premature or to Compel Arbitration."[17] On February 24, 2014 Plaintiff filed an "Opposition to Defendants' Motion to Dismiss as Premature or Compel Arbitration."[18] On March 5, 2014, with

---

[12] Rec. Doc. 1 at 1–2. In their Notice of Removal, Southern Energy avers that the amount in controversy exceeds $75,000.00, exclusive of interest and costs and that there is complete diversity between Plaintiff, a Louisiana company, and all Defendants because Defendant Landry, a Louisiana corporation, was improperly joined. *Id.* Southern Energy did not address whether the presence of ABC Transport had any effect on this Court's jurisdiction upon removal.

[13] Rec. Doc. 7–2 at 1–2. Discount Sales, in opposition to Plaintiff's motion, asserted that (1) under 28 U.S.C. § 1441(b)(1), the citizenship of fictitiously-named corporations is irrelevant for purposes of removal; and (2) Plaintiff has not stated any basis for recovery from ABC Transport or Landry. Rec. Doc. 9 at 4–5. NTA and Southern Energy adopted Discount Sales's arguments and supporting authorities. Rec. Doc. 10.

[14] Rec. Doc. 11; Rec. Doc. 13.

[15] Rec. Doc. 32.

[16] Rec. Doc. 16.

[17] Rec. Doc. 20.

[18] Rec. Doc. 21.

leave of Court, NTA and Southern Energy filed a reply in further support of its motion.[19] On that

same day, also with leave of Court, Discount Sales filed a reply in further support of its motion.[20]

## II. Parties' Arguments[21]

### A.     NTA and Southern Energy's "Motion to Dismiss as Premature or to Compel Arbitration"

In support of their motion, NTA and Southern Energy contend that Plaintiff's causes of

action are subject to two "Binding Arbitration Agreement[s] and Jury Waiver[s]" ("Arbitration

Agreements") that Plaintiff allegedly signed on September 27, 2010, and therefore that Plaintiff's

claims must first be submitted to arbitration.[22] Accordingly, NTA and Southern Energy argue,

"[P]laintiff's claims are premature," warranting either dismissal by this Court, or a stay pending

arbitration.[23]

#### 1.     NTA and Southern Energy's Argument that the Federal Arbitration Act Governs the Arbitration Issue Before the Court

As an initial matter, NTA and Southern Energy aver that the Federal Arbitration Act

---

[19] Rec. Doc. 29.

[20] Rec. Doc. 31.

[21] In both pending motions, the defendants discuss Plaintiff's motion to remand to state court. Since the Court denied that motion, it does not include the parties' arguments related to it. Rec. Doc. 32.

[22] Rec. Doc. 16–5 at 1. The parties refer to the arbitration-related documents in both plural and singular terms, but NTA and Southern Energy have appended two separate agreements to their motion. Rec. Doc. 16–4 at 4–6. Since the parties do not distinguish between the agreements, the Court follows the parties' choice of singular or plural terms in this section.

[23] In their briefing, NTA and Southern Energy do not address the question of why *dismissal* would be appropriate. The only place where these parties mention dismissal in their briefing is on the first page of their brief supporting this motion, where they state that "plaintiff's claims are premature, and defendants herein respectfully request that this Court dismiss plaintiff's Petition for Damages without prejudice, or stay these proceedings pending arbitration of plaintiff's causes of action against defendants." *Id.*

("FAA")[24] is to be applied in interpreting the arbitration issue presently before the Court.[25]

According to NTA and Southern Energy, the FAA reflects Congress's intent to "change th[e] anti-arbitration rule" prevailing in most states at the time of the statute's enactment, and to "ensure judicial enforcement of privately made agreements to arbitrate."[26] To effectuate this intent, NTA and Southern Energy contend, the "FAA creates a body of federal substantive law of arbitrability and requires that ambiguities be resolved in favor of arbitration[,] consistent with the federal policy favoring arbitration."[27]

NTA and Southern Energy argue that an agreement to arbitrate is enforceable under the FAA when it is: (1) written; and (2) present in a contract evidencing a transaction involving interstate commerce, where "interstate commerce" means "commerce among the several States or with foreign nations,"[28] a definition that courts have construed to be coextensive with Congress's powers under Commerce Clause of the United States Constitution.[29] Applying this law to the facts in the present case, NTA and Southern Energy argue that the "activity" at issue here meets the FAA's definition of "commerce" because Southern Energy, following federal statutes and regulations, constructed the homes in Alabama out of parts shipped in interstate commerce, and then shipped the homes to

---

[24] 9 U.S.C. §§ 1 *et seq*.

[25] Rec. Doc. 16–5 at 3.

[26] *Id.* (citing *Allied-Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 270--71 (1995) (discussing the "anti-arbitration rule"); *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 220 (1985) (addressing "judicial enforcement.")).

[27] *Id.* at 4 (citing *McKee v. Home Buyers Warranty Corp.*, 45 F.3d 981, 984–85 (5th Cir. 1995)).

[28] *Id.* (citing *McKee*, 45 F.3d at 984; 9 U.S.C. § 1–2).

[29] *Id.* at 4-6 (citing *Perry v. Thomas*, 482 U.S. 483 at 490–91 (1987)).

Mississippi, where they were ultimately sold and delivered to Louisiana.[30]

### 2. NTA and Southern Energy's Argument that the Arbitration Agreements are Enforceable

NTA and Southern Energy further argue that the Arbitration Agreements at issue here are "sufficiently broad in scope to include all of Plaintiff's claims."[31] On this point, NTA and Southern Energy first contend that courts must determine the scope of an arbitration clause by "look[ing] to the factual allegations of the complaint and determin[ing] whether the claims alleged therein touch and concern matters covered by the arbitration provisions."[32] Here, "due regard must be given to the federal policy favoring arbitration," and courts should "resolve[] in favor of arbitration" those "ambiguities as to the scope of the arbitration clause itself."[33] Where a court finds that a contract contains a "broad" arbitration clause (*i.e.* one that seems to cover "all disputes arising out of a contract"), NTA and Southern Energy contend that the "federal presumption in favor of arbitrability applies with even greater force."[34] NTA and Southern Energy contend that "the language of the arbitration agreements could hardly be broader" because the Agreements require arbitration of:

> Any and all claims and disputes arising from or relating to the Contract, the Manufactured Home, and any other disputes between You and Us, including any disputes regarding the enforceability, interpretation, breadth, scope, and meaning of this Agreement.[35]

---

[30] *Id.* at 6–7.

[31] *Id.* at 7.

[32] *Id.* NTA and Southern Energy cite no authority from the United States Fifth Circuit Court of Appeals supporting this point.

[33] *Id.* (quoting *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 476 (1989)).

[34] *Id.* at 7–8 (citing *AT&T Tech., Inc. v. Comm. Workers of Am.*, 475 U.S. 643, 650 (1986)).

[35] *Id.* at 8.

According to NTA and Southern Energy, courts "have interpreted similar, and often more restrictive, language as . . . reaching all disputes having their origin or genesis in the contract whether or not they implicated the interpretation or performance of the contract per se;" thus, NTA and Southern Energy contend, Plaintiff's claims fall within the scope of the agreements even if the Court construes the contract narrowly.[36] Therefore, NTA and Southern Energy state, the FAA requires the Court to stay litigation because, under the statute, "if arbitration is indicated by the contract," as it allegedly is here, then a stay is required.[37]

Finally, NTA and Southern Energy note that although NTA did not sign the Arbitration Agreement, both state and federal courts have concluded that non-signatories may compel arbitration.[38] In fact, the United States Court of Appeals for the Fifth Circuit has recognized six theories for binding a non-signatory to an arbitration agreement,[39] of which, NTA and Southern Energy contend, the"estoppel theory" applies here.[40] NTA and Southern Energy argue that because Plaintiff alleges "concerted misconduct on the part of all defendants," and "improper design, manufacture, and installation," NTA would be "a proper party in the arbitration proceeding."[41]

---

[36] *Id.* (citations omitted).

[37] *Id.* at 9 (citing 9 U.S.C. § 3 and quoting *Pearce v. E.F. Hutton*, 828 F.2d 826, 829-30 (D.C. Cir. 1987)).

[38] *Id.* at 9 (citing *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 254 (5th Cir. 2000), *cert. denied*, 531 U.S. 1013).

[39] *Id.* at 9–10 (citing *Bridas S.A.P.I.C. v. Gov. of Turkmenistan*, 345 F.3d 347, 356 (5th Cir. 2003) (providing that nonsignatories may be bound to an arbitration agreement under theories of: (1) incorporation by reference, (2) assumption; (3) agency; (4) veil-piercing/alter ego; (5) estoppel; and (6) third-party beneficiary).

[40] *Id.* at 10.

[41] *Id.*

## B.    Discount Sales's "Motion to Dismiss as Premature or to Compel Arbitration."

Pursuant to Federal Rule of Civil Procedure 10(c),[42] Discount Sales, in its motion, adopts by reference "the facts, arguments, legal authorities, and exhibits presented in and with [NTA and Southern Energy's] Motion to Dismiss as Premature or to Compel Arbitration."[43] Discount Sales further contends that, as the "Dealer," it is covered by terms including the "Dealer" as a party to the Arbitration Agreements.[44] As such, Discount Sales contends, "the claims raised by the Plaintiff in this action against Discount Sales are subject to arbitration, per the terms and conditions of the Agreements," and the claims "must be dismissed or stayed pending said arbitration proceeding."[45]

## C.    Plaintiff's "Opposition to Defendants' Motion to Dismiss as Premature or Compel Arbitration"

In its opposition to Defendants' motions, Plaintiff invokes Louisiana law as controlling, and claims that "Louisiana law requires a party seeking to compel arbitration to present the Court with a valid arbitration agreement."[46] Here, Plaintiff "disputes the validity of the arbitration agreement with Southern Energy and Discount Sales,"  and maintains that neither Southern Energy nor NTA have standing to compel it to arbitrate since it did not "specifically contract" with them.[47]

---

[42] Federal Rule of Civil Procedure 10(c) provides that: "A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion. A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."

[43] Rec. Doc. 20–1 at 1.

[44] *Id.* at 2.

[45] *Id.* Discount Sales does not specifically address why *dismissal*, rather than a stay, would be appropriate if Plaintiff's claims are subject to arbitration.

[46] Rec. Doc. 21 at 3 (citing *Rodriguez v. Ed's Mobile Homes of Bossier City*, 2004-1082 (La. App. 3d Cir. 12/8/2004); 889 So.2d 461, 463).

[47] *Id.*

1. **Plaintiff's Claims that the Arbitration Agreement is Unenforceable Under State Law**

According to Plaintiff, "Louisiana [c]ourts have consistently refused to enforce" arbitration agreements that strip "the unsuspecting buyer of his right of access to the courts for redress of a grievance."[48] Plaintiff argues that in this case, individuals acting on its behalf "spent time negotiating the price, specifications, and completion/delivery of the two buildings with Discount Sales," but did not learn from Discount Sales that "an arbitration agreement would be a non-negotiable condition of the sale," and therefore, under Louisiana law, the arbitration agreement is unenforceable.[49]

Plaintiff further maintains that even if the FAA were applicable, Section 2 of that statute "provides for the revocation of agreements to arbitrate on the grounds of law and equity."[50] According to Plaintiff, courts resolving a motion to compel arbitration conduct a two-step process: first, courts "determine whether there is a valid agreement to arbitrate between the parties;" second, courts determine "whether any of the issues raised are within the reach of the agreement."[51] In considering whether the parties have agreed to arbitrate a certain matter, Plaintiff contends, the United States Supreme Court has held that "courts generally should apply ordinary state-law principles that govern the formation of contracts."[52] Looking to whether the dispute in question falls

---

[48] *Id.* (citations omitted). In cases where Louisiana courts have refused to enforce such arbitration agreements, Plaintiff argues, (1) "the parties had agreed upon the terms of the sale prior to closing"; (2) the arbitration agreement "was placed unilaterally by the seller in the final contract of sale and was never consented to or even discussed with the buyer in the meetings prior to closing"; and (3) "the inclusion of the arbitration agreement was a non-negotiable term and the refusal of the buyer to submit to arbitration would terminate the process, regardless of the months of preparation and expenditure of money incurred by the buyer." *Id.* at 3-4.

[49] *Id.* at 4.

[50] *Id.* (citing 9 U.S.C. § 2).

[51] *Id.* (citing *Texaco Exploration and Production Co. v. AmClyde Engineered Products Co., Inc.*, 243 F.3d 906, 909 (5th Cir. 2001); *Webb v. Investacorp, Inc.*, 89 F.3d 252, 258 (5th Cir. 1996)).

[52] *Id.* at 5 (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Fleetwood Enterprises, Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002)).

within the arbitration agreement, courts determine "whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims," and here, Plaintiff asserts, Louisiana contract law provides a sufficient constraint to foreclose arbitration.[53]

Applying Louisiana law of contract, plaintiff contends that the "consent of both parties"[54] is necessary to form a valid contract in Louisiana, and that such consent "may be vitiated by error."[55] According to Plaintiff, error can invalidate a contract if it "is related to the principle cause, or motive, for making the agreement," and is "known or should have been known to the other party."[56] According to Plaintiff, "cause" is "the reason why a party obligates himself."[57] Plaintiff claims that error was present here, vitiating the contract.[58]

Plaintiff cites and discusses four Louisiana Third Circuit Court of Appeal decisions in support of its argument. First, Plaintiff points to *Rodriguez v. Ed's Mobile Homes of Bossier City, La.*, in support of the proposition that where "[t]he parties had already agreed upon the terms of [a] contract of sale before closing," and "binding arbitration was not one of them," the arbitration agreement was an unenforceable attempt to "unilaterally assign additional consideration for the perfection of a sale."[59] Similarly, Plaintiff contends that the same court "found an arbitration agreement unenforceable" in *St. Romain v. Cappaert Manufactured Housing, Inc.* due to a lack of

---

[53] *Id.* at 10–11 (citing *Webb*, 89 F.3d at 258).

[54] *Id.* at 5 (citing LA. CIV. CODE art. 1927).

[55] *Id.* (citing LA. CIV. CODE. art. 1948).

[56] *Id.* (citing *Scott v. Bank of Coushatta*, 512 So.2d 356, 361 (La. 1987)).

[57] *Id.*

[58] *Id.* at 11.

[59] *Id.* at 6 (citing *Rodriguez*, 2004–1082 (La. App. 3 Cir. 12/8/04), 889 So.2d 461).

evidence that the arbitration agreement "formed part of the consideration for the original purchase agreement,"[60] and found in *Abshire v. Belmont Homes, Inc.* that an arbitration agreement signed at the same time as a sales agreement was not a necessary condition of sale and thus was not "part of the consideration of the original purchase agreement."[61] Finally, Plaintiff cites *Quebedeaux v. Sunshine Homes, Inc.*, in support of the proposition that "certain arbitration clauses related to sales lack consent" because they "are adhesionary, and thus unenforceable."[62] According to Plaintiff, *Rodriguez*, *Abshire*, and *Quebedeaux* "are directly on point to the matter at hand,"[63] because Plaintiff entered into a sales contract that included "the agreement, the price, and the object," plus a deposit for sale, but did not then consent to arbitration.[64]

Plaintiff also tries to distinguish this case from the Louisiana Supreme Court case *Coleman v. Jim Walter Homes*, wherein the Louisiana Supreme Court upheld an arbitration agreement on similar facts as those present here, because the plaintiff in that case read, understood, and accepted an arbitration agreement that was incorporated by reference in the "original building contract" with the defendant.[65] Plaintiff argues that it did not agree to arbitrate or sign any acknowledgment of an agreement to arbitrate when it agreed to purchase the homes.[66] According to Plaintiff, Southern Energy and Discount Sales have failed to meet their burden of showing a valid and enforceable

---

[60] *Id.* at 7 (citing *St. Romain*, 2005–0140 (La. App. 3 Cir. 6/1/05), 903 So.2d 1186).

[61] *Id.* at 6–7; 8 (citing *Abshire*, 2004–1200 (La. App. 3 Cir. 3/2/05), 896 So.2d 277).

[62] *Id.* (citing *Quebedeaux*, 2006–349 (La. App. 3 Cir. 10/11/06), 941 So.2d 162).

[63] *Id.* at 8.

[64] *Id.*

[65] *Id.* at 9 (citing *Coleman*, 2008–1221 (La. 3/17/09), 6 So.3d 179).

[66] *Id.* at 9–10.

arbitration contract based upon mutual consent,[67] because: (1) Discount Sales did not discuss the Arbitration Agreement during negotiations or when Plaintiff tendered a down payment; (2) the Arbitration Agreement was not "present for signature until closing," may have been signed by Southern Energy after the closing, and (3) Defendants have furnished "no evidence" to "prove that the arbitration agreement was part of the consideration of the original purchase agreement" signed on April 17, 2012.[68]

### 2. Plaintiff's Argument that NTA and Discount Sales are not Third-Party Beneficiaries of the Arbitration Agreement

Plaintiff next contends that NTA and Discount Sales are not third-party beneficiaries to the Arbitration Agreement under Louisiana law.[69] Under Louisiana law, Plaintiff alleges, "a contract for the benefit of a third party is referred to as a stipulation *pour autri*."[70] "In order to establish a stipulation *pour autri*," Plaintiff maintains: (1) "there must be a clear expression of intent to benefit the third party"; (2) "the third party relationship must form the consideration for the condition of the contract" and "may not be merely incidental to the contract"; and (3) the contract "must be in writing and clearly manifest an intention to confer a benefit upon a third party."[71] Further, the party claiming the benefit bears the burden of proof.[72]

---

[67] *Id.* at 10.

[68] *Id.*

[69] *Id.* at 12.

[70] *Id.*

[71] *Id.* at 12-13 (citing *Joseph v. Hospital Serv. Dist. No. 2 of Parish of St. Mary*, 2005–2363 pp. 8–9 (La. 10/15/06), 939 So.2d 1206, 1212) (discussing "clear expression of intent," requirement of a written contract, and clear manifestation of intent); *State in Matter of Adoption of S.R.P.*, 555 So.2d 612, 618 (1989) (addressing "consideration")).

[72] *Id.* at 13 (citing *Joseph v. Hospital Serv. Dist. No. 2 of Parish of St. Mary*, 939 So.2d at 1212)). Plaintiff alleges that the Louisiana Fourth Circuit Court of Appeal in *Simpson v. Pep Boys–Manny Moe & Jack, Inc.* "clarified third party beneficiary status" by suggesting that an agreement that stated that "every potential employee

In this case, Plaintiff contends, the Arbitration Agreement "purports to confer third-party benefit to the 'Dealer' and the 'agents and employees of either,'" and names only Southern Energy as a beneficiary to the agreement.[73] Plaintiff thus argues that it "lacks the clear, unequivocal written expression" designating NTA and Discount Sales as third-party beneficiaries, and accordingly "does not meet the test of a contract for the benefit of a third party."[74] Therefore, Plaintiff argues, the Court should deny "the Motion to Dismiss or Compel Arbitration."[75]

### D. Discount Sales's Reply in Further Support of its "Motion to Dismiss as Premature or Compel Arbitration"

#### 1. Discount Sales's Argument that *Coleman* Applies to the Present Case

In its reply, Discount Sales contends that *Coleman* applies in the present case, and "substantially undermine[s]" the *Rodriguez*, *Abshire*, *St. Romain*, *Quebedeaux*, and *Easterling* decisions upon which Plaintiff relies in its opposition.[76] "Notably," Discount Sales argues, "all of these decisions sprang from the Louisiana Third Circuit Court of Appeals between 2004 and 2007,"[77] before the Louisiana Supreme Court decided *Coleman* in 2009. In *Coleman*, Discount Sales alleges, the plaintiff verbally negotiated a contract with the defendant to build his house, and then signed a "multitude of documents at the closing, including an arbitration agreement."[78] The *Coleman* plaintiff

---

was a third–party beneficiary of every other potential employee's arbitration agreement" was an example of a "clear third party beneficiary contract." *Id.* at 12 (citing *Simpson*, 2003–0358 (La. App. 4 Cir. 4/10/03), 847 So.2d 617, 625). It is not clear to the Court how Plaintiff expects the Court to apply this obtuse citation to *Simpson* in the present case.

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] Rec. Doc. 29 at 3. Plaintiff cites *Easterling* but does not discuss the decision in its briefing.

[77] *Id.* The Louisiana Supreme Court decided *Coleman* in 2009.

[78] *Id.*

13

later sued the defendant, and alleged that "he had not read the arbitration agreement, and it had never been explained to him, so he was not bound by it,"[79] but the Louisiana Supreme Court rejected his arguments, concluding that: (1) the parties intended to reduce their oral sales agreement to writing; but (2) did not form a valid contract until they actually reduced their oral agreement to writing; and (3) when the parties reduced their oral agreement to writing, and included an arbitration agreement in the written document, that agreement became part of the contract.[80]

Discount Sales maintains that since the Louisiana Supreme Court decided *Coleman* "at least two years after the cases cited by the Plaintiff," and since Plaintiff "makes exactly the same arguments as Mr. Coleman made," the *Coleman* decision "effectively negates all of the Plaintiff's arguments in opposition to arbitration in this case.[81] Here, Discount Sales argues, Plaintiff and the Defendants "all obviously intended that their purchase agreements would be reduced to writing and signed[] at the closing."[82] Thus, "the agreements were not formed, and the parties were not bound, until those documents"—including the Arbitration Agreements—"were signed at the closing."[83]

Next, Discount Sales argues that Plaintiff has failed in attempting to distinguish *Coleman* by alleging that its Arbitration Agreements, unlike the agreement at issue in *Coleman*, lacked an "acknowledgment."[84] Discount Sales contends that its Arbitration Agreements state in bold,

---

[79] *Id.* at 3–4 (citing *Coleman*, 6 So.3d at 180–82).

[80] *Id.* at 4.

[81] *Id.*

[82] *Id.*

[83] *Id.* at 4–5. Discount Sales further argues that Plaintiff's Louisiana Third Circuit Court of Appeal cases are distinguishable from the present case, since these cases addressed purchases by consumers, while Plaintiff is a corporate party, and courts presume that corporate parties are "more sophisticated than mere consumers," and are "bound by their contracts."*Id.* at 5–6.

[84] *Id.* at 5.

underlined text, at the top of the first page, "Binding Arbitration Agreement and Jury Waiver."[85] Additionally, Discount Sales asserts, the Arbitration Agreements in this case contained bold, underlined, and capitalized text positioned directly above the signature line stating "IMPORTANT: JURY WAIVER," demonstrating that Plaintiff had notice of them.[86]

## 2. Discount Sales's Argument that the FAA also Requires Arbitration in this Case

Discount Sales next argues that the FAA "may not be undercut by state law seeking to limit the enforcement of arbitration provisions," since the FAA's "'broad principles of enforceability' . . . may not be 'subject to any additional limitations under state law,'" and accordingly, "to the extent that the Louisiana Third Circuit Court of Appeals cases cited by the Plaintiff attempt to restrict or limit the enforceability of the Arbitration Agreements in this case," such restrictions or limitations are not permitted under the FAA."[87]

Addressing Plaintiff's arguments regarding the consideration required to form an arbitration agreement, Discount Sales next contends that "the law is clear that one party's promise to arbitrate is sufficient consideration, or 'cause' to support another party's promise to arbitrate."[88] Here, the Arbitration Agreements at issue "specifically reference the contract by which the Plaintiff purchased the buildings at issue form Discount Sales," making Plaintiff's signature on the Agreements evidence that Plaintiff knew "of the existence of the Arbitration Agreement."[89]

---

[85] *Id.*

[86] *Id.*

[87] *Id.* at 5–6.

[88] *Id.* at 6 (citing, among other federal cases from outside Louisiana and the Fifth Circuit, *Reynolds v. Hallibrton Company*, 217 F. Supp.2d 756, 758) (E.D. Tex. 2002)).

[89] *Id.* at 7.

15

Furthermore, Discount Sales contends, the question of arbitrability in this case is one for the arbitrator, not the Court, because the Arbitration Agreements "specifically mandate arbitration for 'any and all claims and disputes," including "any disputes regarding the enforceability, interpretation, breadth, scope, and meaning of this Agreement."[90] According to Discount Sales, this contractual language, combined with Plaintiff's signature on the Agreements, "establishes that the Plaintiff agreed that the issue of arbitrability must be decided by the arbitrator."[91]

### 3. Discount Sales's Argument that it is a Party to the Arbitration Agreements

Finally, Discount Sales argues that it is a third-party beneficiary to the Arbitration Agreements, because the Agreements "specifically state that the 'Dealer'"—here, Discount Sales—"is a party and is covered by the arbitration provisions."[92] Indeed, Discount Sales alleges, it "signed the Arbitration Agreements in the space provided for the 'Dealer,'" making it a named party to the Agreements.[93]

### D. NTA and Southern Energy's Reply in Further Support of its "Motion to Dismiss as Premature or to Compel Arbitration"

### 1. NTA and Southern Energy's Argument that *Coleman* Controls in this Case

In their brief in further support of its "Motion to Dismiss as Premature, or Compel Arbitration," NTA and Southern Energy argue that *Coleman* is not distinguishable from the present case, and that *Coleman*, accordingly, controls.[94] NTA and Southern Energy contend that: (1) in

---

[90] *Id.*(citing *First Options of Chicago*, 514 U.S. at 943–45 (stating that "[c]ourts should not assume that the parties agreed to arbitrate unless there is clear and unmistakable evidence that they did so").

[91] *Id.*

[92] *Id.*

[93] *Id.* at 8.

[94] Rec. Doc. 31 at 1.

*Coleman*, as here, the arbitration agreement at issue set forth its terms in clear, unambiguous language; (2) here, as in *Coleman*, Plaintiff points out that it never discussed arbitration with the Defendants; and (3) in *Coleman*, as in this case, the plaintiff argued that the arbitration agreement was unenforceable due to an "error of consent."[95] Thus, NTA and Southern Energy maintain, "it is irrelevant" under *Coleman* "that the [Arbitration] [A]greement is not referenced in the purchase agreement with Discount Sales" and was purportedly "a non-negotiable condition of sale," since Plaintiff signed the Arbitration Agreement and is accordingly presumed to be aware of its contents and bound by its written consent to its terms.[96] NTA and Southern Energy further argue that "one party's promise to arbitrate is sufficient consideration, or 'cause' to support another party's promise to arbitrate," and that Plaintiff's case citations to the contrary are factually distinguishable, "have been severely undermined by *Coleman*," and are not controlling.[97]

According to NTA and Southern Energy, *Dufrene v. HBOS Mfg., LP* is analogous to the present case.[98] There, NTA and Southern Energy argue, the Louisiana Fourth Circuit Court of Appeal found an arbitration agreement enforceable notwithstanding the fact that the agreement was "contained in a separate document from the Bill of Sale and the Agreement to Purchase," and not referenced by the Bill of Sale, because "the Arbitration Agreement and its addendum specifically incorporate[d] by reference the Bill of Sale and Purchase Agreement."[99] Likewise here, NTA and Southern Energy argue, the Arbitration Agreement specifically incorporated by reference the sales

---

[95] *Id.* at 2.

[96] *Id.* at 2–3.

[97] *Id.* at 4.

[98] *Id.* at 5 (citing *Dufrene*, 2003-2201 (La. App. 4 Cir. 4/7/04), 872 So.2d 1206).

[99] *Id.* (quoting *Dufrene*, 825 So.2d at 1211).

contract, and the fact that Plaintiff signed the Arbitration Agreement establishes that Plaintiff knew it existed.[100]

### 2. NTA and Southern Energy's Argument that all Three Defendants are Parties to the Arbitration Agreement

NTA and Southern Energy next argue all three defendants are parties to the Arbitration Agreement, because: (1) Discount Sales was a signatory to the Agreement, making Plaintiff's arguments regarding stipulations *pour autri* superfluous, and (2) under the FAA, non-signatories may compel arbitration under the "intertwined claims" theory.[101] Here, NTA and Southern Energy contend, the "intertwined claims" theory applies because Plaintiff brings negligence claims against Southern Energy (a signatory to the Arbitration Agreement) and NTA that are interdependent.[102] In the alternative, NTA and Southern Energy contest Plaintiff's argument that Southern Energy is not a valid signatory to the Arbitration Agreement by arguing: (1) that Southern Energy signed the agreement, and (2) that Louisiana law provides that parties' conduct may demonstrate the validity of an arbitration agreement.[103]

### 3. NTA and Southern Energy's Argument that the Arbitrator Should Determine Whether Plaintiff's Claims are Arbitrable

Finally, NTA and Southern Energy contend that "the very determination of whether the Arbitration Agreement is enforceable is subject to arbitration by the terms of the Agreement itself."[104] NTA and Southern Energy argue that "clear and unmistakable evidence" demonstrates that the

---

[100] *Id.* at 5–6.

[101] *Id.* at 6.

[102] *Id.* at 7.

[103] *Id.*

[104] *Id.* at 9.

parties agreed to submit to arbitration "[a]ny and all claims and disputes . . . including any disputes regarding the enforceability, interpretation, breadth, scope, and meaning of this Agreement."[105] As such, NTA and Southern Energy argue, "under the clear language of the Agreement, the only issue properly before this Court is the existence of a valid arbitration agreement."[106]

### III. Law and Analysis

#### A.      Whether the Federal Arbitration Act Applies to This Dispute

In *Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*, the United States Court of Appeals for the Fifth Circuit explained that the FAA was "in large part motivated by the goal of eliminating the courts' historic hostility to arbitration agreements."[107] Thus, "Section 2 of the FAA puts arbitration agreements on the same footing as other contracts." This means that, "as a matter of federal law, arbitration agreements and clauses are to be enforced unless they are invalid under principles of state law that govern all contracts."[108]

Presently before the Court are two motions urging the court to either dismiss the action as premature, or stay it "so that the parties may proceed to arbitration."[109] In resolving these motions, it is first necessary to determine whether the action falls within the scope of the FAA. On this point, the FAA, as codified at 9 U.S.C. §§ 1-2, provides the basis for the Court's inquiry; Section 2 states that:

> A **written provision in any maritime transaction or contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter**

---

[105] *Id.* (quoting *First Options of Chicago*,  514 U.S. at 943–45).

[106] *Id.*

[107] 379 F.3d 159, 166 (5th Cir. 2004) (citations omitted).

[108] *Id.*

[109] Rec. Doc. 16 at 2; Rec. Doc. 20 at 1.

**arising out of such contract or transaction**, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds exist at law or in equity for the revocation of any contract.[110]

Section 1 defines "commerce" as meaning "[c]ommerce among the several States or with foreign nations."[111] In *Perry v. Thomas*, the United States Supreme Court concluded that the FAA "provide[s] for the enforcement of arbitration agreements within the full reach of the Commerce Clause [of the United States Constitution]."[112]

The FAA, as codified at 9 U.S.C. § 3, gives federal courts authority to stay litigation pending arbitration; it provides as follows:

If any suit or proceeding be brought in the courts of the United States upon **any issue referable to arbitration under an agreement in writing for such arbitration**, the court in which such suit is pending, **upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement**, shall on application of one of the parties stay the trial of the action until such arbitration has been held in accordance with the terms of the agreement, providing the application for the stay is not in default in proceeding with such arbitration.[113]

As the United States Court of Appeals for the Fifth Circuit has observed, Section 3 of the FAA is mandatory, providing that federal courts "*shall* on application of one of the parties stay the trial of the action."[114]

---

[110] 9 U.S.C. § 2 (emphasis added).

[111] 9 U.S.C. § 1.

[112] 482 U.S. at 490. In *Perry*, the Supreme Court held that § 2 of the FAA preempted a California statute that provided a judicial forum for actions seeking to collect wages, notwithstanding any arbitration agreement between the parties. *Id.* at 484; 492.

[113] 9 U.S.C. § 3 (emphasis added).

[114] *Waste Management, Inc. v. Residuos Industriales Multiquim, S.A. de C.V.*, 372 F.3d 339, 342 (5th Cir. 2004) (construing 9 U.S.C. § 3, reasoning that "[t]he grammatical structure of this sentence would seem to make clear that any of the parties to the suit can apply to the court for a mandatory stay, and the court must grant the stay if the claim at issue is indeed covered by the arbitration agreement," and ordering the district court to grant a nonsignatory's motion to compel arbitration).

Section 4 of the FAA covers motions to compel arbitration; it provides:

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.[115]

In this case, the Arbitration Agreement allegedly pertains to a dispute between a mobile home buyer in Louisiana regarding two Alabama-made mobile homes that were allegedly inspected by an Indiana engineering firm and sold by a Mississippi dealer.[116] Plaintiff does not directly dispute that the FAA applies here, and, given the multiple interstate commercial activities at issue, the Arbitration Agreement plainly involves interstate commerce. Accordingly, the Court concludes that the Arbitration Agreement falls within the scope of the FAA. It will therefore consider whether NTA, Southern Energy, and Discount Sales may obtain the relief they seek under the FAA.

### B.    Whether the Court can Enforce the Arbitration Agreement Under the FAA

If an agreement falls within the scope of the FAA, the Court may proceed to determine whether to compel arbitration under that statute. In *Jones v. Halliburton, Co.*, the United States Court of Appeals for the Fifth Circuit articulated a two-step analysis governing this determination.[117] The first step is comprised of two inquiries: whether a valid agreement to arbitrate exists, and whether the dispute in question falls within the scope of the agreement.[118] "If both questions are answered in the affirmative, [a] court then asks whether any federal statute or policy renders the claims

---

[115] 9 U.S.C. § 4.

[116] Rec. Doc. 1–1 at 2–3. For the sake of consistency, the Court, in its analysis, uses singular terms to describe the arbitration documents.

[117] *See Jones*, 583 F.3d at 233–34.

[118] *Id.* at 234.

nonarbitrable."[119]

## 1. Whether the Arbitration Agreement is Valid

Applying the first subpart of the two-step analysis set forth in *Jones v. Halliburton, Co.*,[120] it is first necessary to consider whether a valid agreement to arbitrate exists. In making this determination, the Court applies "ordinary state-law principles that govern the formation of contracts."[121] To determine whether a valid agreement to arbitrate exists, courts in the United States Fifth Circuit apply "ordinary state-law principles that govern the formation of contracts."[122] For example, in *Fleetwood Enterprises, Inc. v. Gaskamp*, the United States Fifth Circuit Court of Appeals applied Texas contract law to determine whether non-signatories were bound by an arbitration agreement.[123] Similarly, in *May v. Higbee Co.*, the United States Court of Appeals for the Fifth Circuit applied Mississippi law to resolve the question of whether the plaintiff sufficiently manifested assent to an arbitration agreement.[124]

The parties do not contest that Louisiana law applies here. In *Wiltz v. Bayer CropScience Ltd. Partnership*, the United States Court of Appeals for the Fifth Circuit explained how federal courts apply Louisiana law:

> In a diversity case such as this one, we apply state substantive law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) . . . When faced with unsettled questions of Louisiana law, we adhere to Louisiana's Civilian decision-making process by first examining primary sources of law, namely, Louisiana's Constitution, codes, and

---

[119] *Id.*

[120] *Id.* at 233.

[121]*Fleetwood*, 280 F.3d at 1073. In this case, the parties do not dispute that Louisiana law applies to this step of the inquiry.

[122]*Fleetwood Enterprises, Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002).

[123] *Id.* at 1073-77.

[124] 372 F.3d 757, 764-65 (5th Cir. 2004) (quoting *Volt*, 489 U.S. at 475--76).

statutes. *Moore v. State Farm Fire & Cas. Co.*, 556 F.3d 264 (5th Cir.2009). This is because the primary basis of Louisiana's Civil Law is legislation and not the prior decisions of its courts. *In Re: Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir.2007). In the absence of a definitive resolution in the State's primary sources, however, we look next to the final decisions of the Louisiana Supreme Court. *Moore*, 556 F.3d at 269. Only in the absence of such a final decision must we make an "Erie guess" as to how that court would resolve the issue if presented with the same case. *Id.* Although we do not disregard the decisions of Louisiana's intermediate courts unless we are convinced the Louisiana Supreme Court would decide otherwise, we are not strictly bound by them. *In Re: Katrina*, 495 F.3d at 206.[125]

Consequently, the Court, applying Louisiana contract law, considers, in this order, (1) Louisiana statutes; (2) Louisiana Supreme Court decisions; and (3) Louisiana Court of Appeal decisions.

Under Louisiana law, when a defendant urges the court to deny judicial relief because the plaintiff's claims are covered by a valid arbitration agreement, the defendant "has the burden of showing the existence of a valid contract to arbitrate."[126] In the present case, NTA and Southern Energy have presented a copy of the Arbitration Agreement that was allegedly signed by employees of Fin & Feather, Discount Sales, and Southern Energy.[127] Plaintiff does not expressly deny that it signed an arbitration agreement; rather, Plaintiff asserts that the Agreement is invalid under the Louisiana contract law doctrine of "error."[128]

### a.    Whether Error Vitiates Plaintiff's Consent

Article 1927 of the Louisiana Civil Code provides that "[a] contract is formed by the consent of the parties established through offer and acceptance." Error is a Louisiana contract defense that goes to consent. Defining that defense, Article 1949 of the Louisiana Civil Code provides that:

Error vitiates consent only [1] when it concerns a cause without which the obligation

---

[125] 645 F.3d 690, 695 (5th Cir. 2011).

[126] *Cook v. AAA Worldwide Travel Agency*, 360 So.2d 8329, 841 (La. 1978).

[127] Rec. Doc. 15–6 at 4.

[128] Rec. Doc. 21 at 8.

would not have been incurred and [2] that cause was known or should have been known to the other party.

The term "cause" is defined by Article 1967 of the Louisiana Civil Code as "the reason why a party obligates himself." Standing alone, these Code provisions do not sufficiently inform the Court to enable it to decide whether Plaintiff validly consented to the Arbitration Agreement. Consequently, following *Wiltz*,[129] the Court turns to final decisions of the Louisiana Supreme Court for guidance.

In *Coleman v. Jim Walter Homes*, the Louisiana Supreme Court addressed whether error vitiated consent where the purchaser of a mobile home alleged that an arbitration agreement was unilaterally added by the seller to the sales documents at closing.[130] Similarly to Plaintiff here, Coleman did not "dispute that a written arbitration agreement exist[ed] or that the suit [was] . . . referable to arbitration under that agreement."[131] The crux of Coleman's argument was that the arbitration agreement was unenforceable due to error of consent. Citing Louisiana Civil Code Article 1949, the Court held that it is:

> [C]lear the principal cause of the contract between the parties was the building of a home. There is no indication that the procedure for future litigation over the contract was the cause without which the obligation would not have been incurred.[132]

"Thus," the court held, "to the extent there was unilateral error by Mr. Coleman concerning the arbitration agreement, we do not find such error is sufficient to vitiate his consent to the contract."[133]

Moreover, citing its decision in *Aguillard v. Auction Management Corp.*,[134] the court

---

[129] 645 F.3d at 695.

[130] 2008–1221 (La. 3/17/09), 6 So. 3d 179.

[131] *Id.* at 182-3.

[132] *Id.* at 183.

[133] *Id.* at 183.

[134] 04-2804 (La. 6/29/05), 908 So.2d 1.

explained that "a party who signs a written agreement is presumed to know its contents and cannot avoid its obligations by contending that he did not read it, that he did not understand it, or that the other party failed to explain it to him."[135]

Applying *Wiltz* and considering how the Louisiana Supreme Court would adjudicate the present case, the Court finds that the Louisiana Supreme Court would find that *Coleman* controls, and would require the Court to find a valid arbitration agreement here. In this case, as in *Coleman*, the parties completed the purchase and fully memorialized it in writing at closing. Here, as in *Coleman*, Plaintiff signed the Arbitration Agreement, and is therefore "presumed to know its contents."[136] Also here, like in *Coleman*, the principal cause of the contract was the purchase of the homes; there is no indication that consent to arbitration was a necessary condition of the sale. Finally, Plaintiff states that it "has no recollection of being presented with the document for signature," but *Coleman* provides that a party "cannot seek to avoid its obligations by contending that [it] did not read or understand" an agreement.[137] Therefore, the Court finds *Coleman* instructive and persuasive on this issue.

The Louisiana Supreme Court's *Coleman* decision is in tension with a series of decisions from the state's Third Circuit Court of Appeal. These decisions—*Rodriguez v. Ed's Mobile Homes of Bossier City, La.*;[138] *Abshire v. Belmont Homes*;[139] *St. Romain v. Cappaert Manufactured Housing,*

---

[135] *Coleman*, 6 So. 3d at 183 (citing *Aguillard*, 908 So.2d 1).

[136] *Id.* at 184.

[137] Rec. Doc. 21 at 4; 10; 6 So.3d at 184.

[138] 889 So. 2d at 464.

[139] 896 So.2d. at 285.

*Inc*;[140] and *Quebedeaux v. Sunshine Homes, Inc.*[141]—stand for the propositions that consent to arbitration agreements may be vitiated by error when: (1) the plaintiff is required to sign the arbitration agreement after making a payment in order to avoid losing that payment, as in *Rodriguez* and *Quebedeaux*, (2) the plaintiff signs an arbitration agreement after paying for, and financing, their purchase in full, as in *Abshire*; or (3) the plaintiff never signs the agreement, as in *St. Romain.* Plaintiff here seeks to vitiate consent on different grounds, and these decisions all pre-date the Louisiana Supreme Court's *Coleman* decision. Since *Coleman* is on point with the present case, this Court need not address these older decisions here.

### b. Conclusion

Southern Energy and Discount Sales argue that Plaintiff signed an arbitration agreement with them. Plaintiff does not deny that it signed such an agreement. After considering the FAA and the Louisiana authorities, the Court finds no reason to conclude that the Arbitration Agreements at issue here were invalid due to "error."[142] Indeed, the Louisiana Supreme Court's reasoning in *Coleman* suggests, for the reasons stated above, that the Louisiana Supreme Court would hold that Plaintiff formed a valid agreement to arbitrate.[143] Consequently, the Court concludes that the Defendants have carried their burden of proving that a valid agreement to arbitrate exists.

### 2. Whether the Parties' Dispute Falls Within the Scope of the Agreement

Following *Jones*, if the Court finds that the parties formed a valid contract under state law, it next considers whether the dispute at issue falls within the scope of the arbitration agreement.  In

---

[140] 903 So.2d at 1190.

[141] 941 So.2d at 165.

[142] The Court declines to address Discount Sales's argument, made without reference to Louisiana law, that one party's promise to arbitrate is sufficient consideration to support another party's promise to arbitrate.

[143] Rec. Doc. 21 at 4; 10.

*Waste Management v. Residuos Industriales Multiquim, S.A. de C.V.*, the United States Court of Appeals for the Fifth Circuit explained that "[c]ourts determining whether a particular claim falls within the scope of the arbitration agreement focus on factual allegations in the complaint rather than the legal causes of action asserted. If the allegations underlying those claims 'touch matters' covered by the parties' agreements, then those claims must be arbitrated, whatever the legal labels attached to them."[144] In *Tittle v. Enron*, the United States Court of Appeals for the Fifth Circuit explained that, in cases where a contract contains an arbitration clause, courts apply state law to interpret its scope, but apply a federal "presumption of arbitrability," meaning that any ambiguities regarding the scope of the agreement "are resolved in favor of arbitration."[145]

At this stage, following *Tittle*, the Court applies Louisiana law to interpret the scope of the agreement, but applies a "presumption of arbitrability," resolving any ambiguities regarding the scope of the agreement "in favor of arbitration."[146] Pursuant to *Waste Management*, the Court looks to the factual allegations in Plaintiff's complaint, rather than to the specific causes of action Plaintiff states.[147]

Defendants, who have the burden to show the scope of the Arbitration Agreement, argue that the agreement covers "any and all claims and disputes," including those concerning the threshold matter of whether a dispute is arbitrable in the first instance.[148] Plaintiff does not address the issue. In considering whether the parties agreed to submit the question of arbitrability to the arbitrator, the

---

[144] 372 F.3d 339, 344 (5th Cir. 2004).

[145] 463 F.3d 410, 418 (5th Cir. 2006) (applying Texas law to determine the disputed scope of an arbitration agreement).

[146] *Id.*.

[147] *Waste Management*, 372 F.3d at 344.

[148] Rec. Doc. 29 at 7.

rule set forth in *First Options of Chicago* requires that the Court identify "clear and unmistakable evidence" of such an agreement.[149] Here, the Arbitration Agreements provide that the parties agree to arbitrate "any disputes regarding the enforceability, interpretation, breadth, scope, and meaning of [the] Agreement."[150] Applying *Tittle*'s presumption in favor of arbitrability and resolving all ambiguities in favor of arbitration, the Court finds that the Arbitration Agreement, in ostensibly covering all issues that arise between the parties, including the issue of arbitrability itself, resolves the issues in dispute here.

### 3. Whether Grounds in Law or Equity Invalidate the Contract

Finally, if the parties have formed a valid agreement to arbitrate, and the dispute at issue falls within the scope of the agreement, "[a] court then asks whether any federal statute or policy renders the claims nonarbitrable."[151] On this point, Plaintiff argues only that the Louisiana contract law doctrine of "error" invalidates his consent to arbitration. Since the Court has resolved this issue, it need not re-visit Plaintiff's arguments on this point.

### C. Who May Request Enforcement of an Arbitration Agreement Under the FAA

Not all of the movants in the present case signed the Arbitration Agreement at issue. Consequently, the parties dispute who may compel arbitration under the Arbitration Agreement. Plaintiff argues that NTA and Discount Sales are not "third party beneficiaries" to the Agreement. Discount Sales contends that it is a signatory to the agreement, and that NTA, although not a signatory, may invoke rights under the Agreement under United States Court of Appeals for the Fifth

---

[149] *See* 514 U.S. at 945.

[150] Rec. Doc. 16–4 at 5.

[151] *Jones*, 583 F.3d at 234.

28

Circuit precedent.

The United States Court of Appeals for the Fifth Circuit has recognized a number of theories under which non-signatories may be bound to submit to arbitration,[152] but the parties have only briefed one theory—equitable estoppel (or the "intertwined" or "inseparable" claims theory)—under which *non-signatories may bind signatories* to submit to arbitration.[153] In *Grigson v. Creative Artists Agency, L.L.C.*, the court explained that a non-signatory may invoke equitable estoppel to compel arbitration in two situations:

> First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory. When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate. Second, application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract. Otherwise the arbitration proceedings between the two signatories would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted.[154]

Applying these principles to the facts in *Grigson*, the United States Court of Appeals for the Fifth Circuit held that the defendants could compel arbitration under a film distribution agreement's arbitration clause, despite being non-parties to the agreement, in an action where the plaintiffs alleged (among other things) that the defendants tortiously interfered with that agreement.[155]

---

[152] *See Bridas S.A.P.I.C. v. Gov. of Turkmenistan,* 345 F.3d 347, 356 (5th Cir. 2003) (noting that "six theories for binding a nonsignatory to an arbitration agreement have been recognized: (a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing/alter ego; (e) estoppel; and (f) third-party beneficiary.")

[153] *See Grigson v. Creative Artists Agency, LLC.*, 210 F.3d 524; *Waste Management*, 372 F.3d 339. Plaintiff argues that NTA and Discount Sales were not "third party beneficiaries" to the Arbitration Agreement and accordingly do not have standing to compel arbitration, but Defendants cite *Grigson* in support of their argument in favor of arbitration, and *Grigson* does not require that a non-signatory be a "third party beneficiary" in order to compel arbitration.

[154] *Grigson*, 210 F.3d at 527.

[155] *Id.* at 210 F.3d at 526; 529-31.

Here, the Plaintiff is a signatory. In every one of the allegations in its complaint, it alleges the same wrongdoing on the part of each Defendant, including NTA, a non-signatory.[156] In *Brown v. Pacific Life Ins. Co.*, the United States Court of Appeals for the Fifth Circuit addressed a similar factual situation, in which the plaintiffs sued a broker, a brokerage firm, and firms offering annuities in which the plaintiffs invested; the broker and brokerage firm had signed an arbitration agreement with the plaintiffs, while the annuity-offering firms had not. [157] There, the United States Court of Appeals for the Fifth Circuit affirmed the district court's finding that the plaintiffs were equitably estopped from asserting that the annuity-offering firms, as non-signatorories, could not compel arbitration, because: "[w]hether and how [those firms] . . . defrauded or breached duties owed to the [Plaintiffs] depends, in some part, upon the nature of tortious acts allegedly committed by . . . [the broker and brokerage firm]—acts that would be covered by the arbitration agreement—as well as any tortious acts by [the annuity-offering firms.]"[158] Likewise, Plaintiff in the present case does not distinguish between the alleged misconduct of any Defendant. As such, the Court finds that Plaintiff has alleged "substantially interdependent and concerted misconduct" between non-signatories and signatories, placing the dispute within the scope of *Grigson* and *Brown*. Accordingly, NTA may invoke equitable estoppel to compel arbitration in the present case.

Further, in *Waste Management,* the United States Court of Appeals for the Fifth Circuit explained that, "in certain limited circumstances," non-signatories to an arbitration agreement may request the court to *stay* litigation pending arbitration.[159] Thus, the court stated:

---

[156] Rec. Doc. 1–1 at 6–10.

[157] 462 F.3d 384, 389 (5th Cir. 2006).

[158] *Id.* at 399.

[159] 372 F.3d at 342.

[W]e have ordered stays on the application of non-signatories in three recent cases. In *Subway Equipment Leasing Corp. v. Forte*,[160] we applied § 3 to non-signatory affiliates of a signatory corporation, where the claims against them were based entirely on rights arising from the contract containing the arbitration clause. Similarly, in *Harvey* [*v. Joyce*],[161] **we invoked § 3 on behalf of a non-signatory corporation whose potential liability arose and was inseparable from the claims against its signatory owner**. Most recently, in *Hill* [*v. General Electric Power Systems, Inc.*][162], we applied § 3 where a non-signatory lender's potential liability was inherently inseparable from claims against the second party to an arbitration agreement.[163]

"Synthesizing" its precedent on this point, the court noted that, "in certain limited circumstances" non-signatories to an arbitration agreement may request the court to *stay* litigation pending arbitration in circumstances where:

> **[1] the arbitrated and litigated disputes . . . involve the same operative facts; [2] the claims asserted in the arbitration and litigation are "inherently inseparable"**; and [3] the litigation has a "critical impact" on the arbitration. The question is not ultimately one of weighing potential harm to the interests of the non-signatory, but of determining whether proceeding with litigation will **destroy the signatories'** right to a meaningful arbitration.[164]

In *Harvey v. Joyce*, the United States Court of Appeals for the Fifth Circuit concluded that litigation against a non-signatory corporation would have a "critical impact" on arbitration involving the signatory owner where the non-signatory corporation's "whose potential liability arose and was inseparable from the claims against its signatory owner."[165] In *Hill v. G.E. Power Systems, Inc.*, the

---

[160] 169 F.3d 324, 329 (5th Cir. 1999).

[161] 199 F.3d 790, 793 (5th Cir. 2000).

[162] 282 F.3d 343, 348 (5th Cir. 2002).

[163] *Id.* at 342.

[164] 372 F.3d at 342.

[165] *Waste Management*, 373 F.3d at 342 (citing *Harvey*, 199 F.3d 790, 796 (5th Cir. 2000) ("If CTC [the non-signatory] were forced to try the case, the arbitration proceedings [against the signatory owner] would be both redundant and meaningless; in effect, thwarting the federal policy in favor of arbitration.")

United States Court of Appeals for the Fifth Circuit held that allowing a lawsuit to proceed against the non-signatory would "undermine the arbitration proceedings" between the signatories, "thereby thwarting the federal policy in favor of arbitration."[166]

In this case, Plaintiff brings each of its claims against every Defendant, and makes no distinctions between Defendants in any of its claims. Thus, (1) the operative facts at issue in any arbitration involving Southern Energy and Discount Sales will likely be the same operative facts at issue in any litigation involving NTA. Because Plaintiff makes the same claims against every defendant, (2) it has provided the Court with no basis to conclude that its claims can be separated. Finally, (3) given that Plaintiff alleges that each defendant is liable for the same damages, splitting the present litigation into two proceedings—one in court, another before an arbitrator—would prevent the arbitrator from fully resolving the present dispute, thereby critically impacting the arbitration and potentially "destroying the signatories' right to a meaningful arbitration." As a result, the circumstances identified in *Waste Management* are present here, and permit each Defendant to seek a stay pending arbitration.

Defendants have urged the court to stay litigation pending arbitration. In Section 3, the Federal Arbitration Act provides that:

> If any suit or proceeding be brought in the courts of the United States upon **any issue referable to arbitration under an agreement in writing for such arbitration**, the court in which such suit is pending, **upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement**, shall on application of one of the parties stay the trial of the action until such arbitration has been held in accordance with the terms of the agreement, providing the application for the stay is not in default in proceeding with such arbitration.

Here, as established above, Plaintiff's claims are referable to arbitration under a written valid agreement providing for such arbitration. Therefore, the Court will grant Defendants' request to stay

---

[166] 282 F.3d 343, 348 (5th Cir. 2002).

these proceedings pending arbitration.

## V. Conclusion

For the reasons stated above,

**IT IS HEREBY ORDERED** that Defendants NTA, Inc., Southern Energy Homes, Inc., and Discount Sales Inc.'s "Motion[s] to Dismiss as Premature or to Compel Arbitration"[167] are **GRANTED**.

**NEW ORLEANS, LOUISIANA**, this  2nd  day of September, 2014.

_____
**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[167] Rec. Doc. 16; Rec. Doc. 20